FILED
United States Court of Appeals
Tenth Circuit

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

December 11, 2012

Elisabeth A. Shumaker
Clerk of Court

---

GAYEN HANCOCK; DAVID CROSS;
MONTEZ MUTZIG; JAMES BOLLINGER,

        Plaintiffs - Appellants,

v.

AMERICAN TELEPHONE AND
TELEGRAPH COMPANY, INC.; AT&T
OPERATIONS, INC.; SOUTHWESTERN
BELL TELEPHONE COMPANY, LP;
PACIFIC BELL TELEPHONE COMPANY;
ILLINOIS BELL TELEPHONE
COMPANY; INDIANA BELL
TELEPHONE COMPANY
INCORPORATED; MICHIGAN BELL
TELEPHONE COMPANY; NEVADA
BELL TELEPHONE COMPANY; THE
OHIO BELL TELEPHONE COMPANY;
WISCONSIN BELL, INC.; THE
SOUTHERN NEW ENGLAND
TELEPHONE COMPANY; BELLSOUTH
TELECOMMUNICATIONS, INC.; AT&T
SOUTHEAST, INC.,

        Defendants - Appellees.

No. 11-6233

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
(D.C. NO. 5:10-CV-00822-W)**

---

Richard A. Westfall (Peter J. Krumholz and Matthew W. Spengler, with him on the
briefs), Hale Westfall, LLP, Denver, Colorado, appearing for Appellants.

Archis A. Parasharami, Mayer Brown, LLP, Washington, DC (Evan M. Tager and
Theodore J. Weiman, Mayer Brown, LLP, Washington, DC; Curtis Long, Fellers, Snider,
Blankenship, Bailey & Tippens, Tulsa, Oklahoma; J. Henry Walker, IV, Cindy D.
Hanson, and John P. Jett, Kilpatrick Stockton, LLP, Atlanta, Georgia, with him on the
brief), appearing for Appellees.

Before **MURPHY, EBEL,** and **MATHESON,** Circuit Judges.

**MATHESON**, Circuit Judge.

Gayen Hancock, David Cross, Montez Mutzig, and James Bollinger (collectively

"Plaintiffs") seek to represent a class of customers dissatisfied with "U-verse," a digital

telecommunications service. The United States District Court for the Western District of

Oklahoma dismissed their claims based on forum selection and arbitration clauses in the

U-verse terms of service. Plaintiffs appeal the dismissal of their claims.

Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm.

## I. BACKGROUND

### A. *Factual History*

#### 1. *U-verse and Terms of Service*

U-verse is the brand name for a telecommunications service that includes digital

television ("TV"), voice-over Internet protocol ("Voice"), and high-speed Internet

("Internet"). At the time Plaintiffs purchased U-verse, customers could receive TV alone

or bundle it with Voice and/or Internet for a discounted rate.

One set of terms of service governs U-verse TV and Voice services ("TV/Voice terms"). The TV/Voice terms have a forum selection provision stating that, in the event of litigation, AT&T and U-verse customers "agree to submit to the . . . jurisdiction of the courts located within the county of Bexar County, Texas" ("Forum Selection Clause"). Aplt. Appx. at 1007.

Different terms of service govern U-verse Internet service ("Internet terms"). The Internet terms include an arbitration provision stating that AT&T and the customer "agree to arbitrate all disputes and claims . . . based in whole or in part upon the [Internet service]" ("Arbitration Clause"). *Id.* at 778.

2. *Parties*

Plaintiffs are individuals who purchased U-verse in either Florida or Oklahoma. Their complaint names 13 defendants and alleges that U-verse is "plagued by defects and deficiencies." *Id.* at 26. Plaintiffs seek to represent a class of U-verse customers who experienced similar problems with U-verse.

This appeal principally involves three defendants: AT&T Operations, Inc. ("AT&T");[1] Southwestern Bell Telephone Company ("Southwestern Bell"); and BellSouth Telecommunications, Inc. ("BellSouth") (collectively "Defendants"). AT&T "is the entity ultimately responsible for . . . U-verse in the areas provisioned by

---

[1] AT&T Operations, Inc., merged into AT&T Services, Inc., after Plaintiffs filed their complaint. For purposes of this litigation, however, it has been referred to as "AT&T Operations," "AT&T Ops," or "AT&T."

Southwestern Bell . . . and BellSouth." *Id.* at 1051. Southwestern Bell and BellSouth are

AT&T regional affiliates who install and provide U-verse services for customers in

Oklahoma and Florida, respectively.[2]

### B. *Procedural History*

#### 1. *Complaint and Motions to Dismiss*

Plaintiffs filed their class action complaint on July 30, 2010, in the U.S. District

Court for the Western District of Oklahoma. They asserted claims under the Racketeer

Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 et seq., as well as various

claims under state law.

In October 2010, AT&T and Southwestern Bell filed two motions to dismiss

Plaintiffs' claims. The first motion cited the Forum Selection Clause and moved under

Fed. R. Civ. P. 12(b)(3) to dismiss Plaintiffs' TV/Voice-related claims for improper

venue or, alternatively, to transfer venue to the U.S. District Court for the Western

District of Texas under 28 U.S.C. § 1404(a). The second motion cited the Arbitration

Clause and moved to dismiss Plaintiffs' Internet-related claims and to compel arbitration.

---

[2] The other 10 named defendants are AT&T, Inc.; Pacific Bell Telephone
Company; Illinois Bell Telephone Company; Indiana Bell Telephone Company, Inc.;
Michigan Bell Telephone Company; Nevada Bell Telephone Company; The Ohio Bell
Telephone Company; Wisconsin Bell, Inc.; The Southern New England Telephone
Company; and AT&T Southeast, Inc.

BellSouth and the other 10 named defendants joined AT&T and Southwestern Bell's two motions.[3]

To show that Plaintiffs accepted the TV/Voice terms and Internet terms—including the corresponding Forum Selection Clause and Arbitration Clause—Defendants proffered declarations from AT&T employees. The declarations recount the standard practice for customer acceptance of U-verse TV/Voice and Internet terms (the "standard practice").

### a. *Standard Practice for Acceptance of TV/Voice Terms*

According to the declarations, the following standard practice applies to customer acceptance of the TV/Voice terms.

When a customer orders U-verse TV/Voice service, the order is sent to AT&T's Global Craft Access System ("GCAS"). A technician reviews the order and responds to install the TV/Voice service. The technician provides the customer with a Welcome Kit, which contains a printed copy of the TV/Voice terms. The technician gives the customer an opportunity to review the TV/Voice terms before installation.

The technician then displays an acceptance form on the technician's laptop through the GCAS web application. The acceptance form has a check box next to "Terms Of Service." Below the check box, the form states in all capital letters: "Before

---

[3] Alternatively, BellSouth and the other named defendants moved to dismiss for lack of personal jurisdiction. The district court did not address this basis for dismissal, and it is not before us on appeal.

acknowledging below, please review the appropriate documents pertaining to your new AT&T service(s). By selecting 'I Acknowledge' below, you are acknowledging that you have read, understand, and agree to the content of the documents checked above." *Id.* at 883. The customer must click an "I Acknowledge" button below this statement to accept the TV/Voice terms.

The acceptance form is then populated with the customer's name, order number, account number, and date of acceptance and stored on an AT&T server. For customers who prefer a written acceptance form, technicians provide paper copies. Technicians do not install U-verse TV/Voice service until customers accept the terms of service.

According to AT&T's records, Plaintiffs Mutzig, Bollinger, and Hancock "completed the installation of . . . U-verse services and acceptance of the TV/Voice [terms] on the GCAS web application." *Id.* at 879-80.

AT&T was unable to find records confirming that Plaintiff Cross was a U-verse customer. But one of the declarations explains that because Plaintiff Cross is an Oklahoma resident, he would have received U-verse from Southwestern Bell, the sole provider in that state. And because Southwestern Bell's "U-verse activation and acceptance procedures are uniform and mandatory," Plaintiff Cross would have accepted the TV/Voice terms in the same manner as other U-verse customers. *Id.* at 997.

### b. *Standard Practice for Acceptance of Internet Terms*

An AT&T senior product manager for U-verse Internet customer registration and activation described the following standard practice for customer acceptance of U-verse Internet terms.

A new U-verse Internet customer is required to complete an online registration process to activate the service. During the registration process, the customer is presented with a screen that displays AT&T's Internet terms in a scrolling text box. Below the text box are three buttons labeled "Exit Registration," "I Reject," and "I Agree." The customer must click the "I Agree" button to continue with the registration. "Until this process is completed, the new customer will automatically be directed to the U-verse registration page every time he or she attempts to connect to the Internet using a web browser over his or her U-verse High Speed Internet connection." *Id.* at 339.

AT&T's records indicate that Plaintiffs Mutzig, Bollinger, and Hancock completed the U-verse Internet registration process.[4] Plaintiffs Bollinger and Hancock received U-verse Internet when its terms of service included the Arbitration Clause. Plaintiff Mutzig's U-verse Internet registration date was September 29, 2008, before the Internet terms incorporated the Arbitration Clause. In October 2008, AT&T sent an e-mail to customers notifying them of changes to the Internet terms, including the addition of the Arbitration Clause. The e-mail states that "[b]y continuing to use the Service, [customers] signify [their] continued agreement to the terms and conditions set

---

[4] The declaration regarding the standard practice for customer acceptance of U-verse Internet terms does not reference Plaintiff Cross.

forth in the Terms of Service document." *Id.* at 427.  It is undisputed that Plaintiff

Mutzig received this e-mail.

### 2. *Hancock Affidavit*

In response to the motions to dismiss, Plaintiffs provided an affidavit from

Plaintiff Hancock.  He averred that he "did not 'click on' ANY acceptance of U-verse

'Terms of Service' when [he] bought U-verse, and the salesman never told [him] about

any 'Terms of Service.'" *Id.* at 1802.  Plaintiff Hancock further stated that he "was never

aware of the fact that there were actually multiple terms of service for TV, [Voice,] and

Internet services." *Id.*

### 3. *District Court's Orders*

In separate orders tailored to each Plaintiff, the district court granted Defendants'

motion to dismiss/transfer venue on the TV/Voice-related claims and their motion to

dismiss/compel arbitration on the Internet-related claims.  Concluding that the Forum

Selection Clause was mandatory and unambiguous, the court dismissed Plaintiffs'

TV/Voice-related claims without prejudice.  The court dismissed with prejudice

Plaintiffs' Internet-related claims and compelled arbitration of those claims, holding that

the Arbitration Clause governed and was enforceable under the Federal Arbitration Act

and state law.

With respect to the remaining named defendants, the district court held that all of

Plaintiffs' TV/Voice- and Internet-related claims were "intertwined with, subject to, and

dependent upon" the U-verse terms of service. *Id.* at 2141, 2146.  Accordingly, the court

-8-

dismissed Plaintiffs' claims against all remaining defendants as subject to the Forum

Selection and Arbitration Clauses.

Plaintiffs filed a timely appeal from the district court's orders of dismissal.

## II.    **DISCUSSION**

Plaintiffs argue the district court erred in dismissing their claims on the basis of

the Forum Selection and Arbitration Clauses.  They do not challenge the language of the

clauses.  Instead, Plaintiffs assert they did not knowingly accept the TV/Voice and

Internet terms, and therefore the Forum Selection and Arbitration Clauses cannot be

enforced against them.

Plaintiffs' argument is divided into two parts.  First, Plaintiffs contend that under

Defendants' described standard practice, customers cannot knowingly accept the U-verse

TV/Voice and Internet terms.  This argument focuses on whether, as a matter of law,

Defendants' standard practice gives U-verse customers adequate disclosure of the terms

and an adequate opportunity to review and accept them.

Second, Plaintiffs argue that the district court failed to draw reasonable inferences

and resolve disputed facts in their favor.  Specifically, Plaintiffs contend that the district

court failed to recognize that (1) Defendants' declarations are not based on personal

knowledge of whether Southwestern Bell and BellSouth carry out the standard practice;

(2) the Hancock affidavit raises a factual dispute about his acceptance of U-verse terms of

service; (3) there is no evidence that Plaintiff Cross accepted any terms of service; and

(4) there is some evidence that Southwestern Bell does not follow a uniform, standard

practice. If these issues are viewed and resolved in their favor, Plaintiffs argue, they are

entitled to an evidentiary hearing and limited discovery to determine whether Defendants

followed the standard practice and whether Plaintiffs accepted the U-verse terms.

We address Plaintiffs' arguments in turn.

### A. *Defendants' Standard Practice and Customer Acceptance of Terms*

Defendants use "clickwrap" agreements as part of their standard practice for

customer acceptance of the TV/Voice and Internet terms. Clickwrap is a commonly used

term for agreements requiring a computer user to "consent to any terms or conditions by

clicking on a dialog box on the screen in order to proceed with [a] . . . transaction."

*Feldman v. Google, Inc.*, 513 F. Supp. 2d 229, 236 (E.D. Pa. 2007).

Plaintiffs do not dispute that courts generally uphold clickwrap agreements. But

they argue that the process through which customers agree to U-verse terms of service,

including Defendants' use of clickwrap agreements, is "so byzantine and confusing that

Plaintiffs could not possibly have knowingly consented to the arbitration and forum

selection clauses." Aplt. Br. at 2. Plaintiffs therefore dispute whether Defendants'

standard practice for customer acceptance of U-verse terms can form binding contracts as

a matter of law. *See id.* at 21-22 ("[T]he U-verse process . . . is so lengthy, confusing,

and reliant on critical interactions between the installer and the customer that it cannot, as

a matter of law, comply with standard contract principles of offer and acceptance.").

We apply state law principles to determine whether a contract has been formed.

*See First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). Here, the parties

agree that Florida law and Oklahoma law apply because Plaintiffs obtained U-verse

services in those states. The parties agree that we review de novo whether, as a matter of

law, Defendants' standard practice provides sufficient notice of and an opportunity to

agree to the terms of service. *See Elliot v. Turner Const. Co.*, 381 F.3d 995, 1001 (10th

Cir. 2004) ("[W]hether a legal conclusion based upon undisputed facts is correct is a

matter of law."); *see also Effron v. Sun Line Cruises, Inc.*, 67 F.3d 7, 9 (2d Cir. 1995)

(explaining that reasonable notice of a forum selection clause is a question of law

reviewed de novo).

We first address whether Defendants' use of clickwrap agreements creates binding

contracts under Florida and Oklahoma law. We then address Plaintiffs' additional

challenges to Defendants' standard practice for customer acceptance of U-verse terms.

### 1. *Clickwrap Agreements*

Clickwrap agreements are increasingly common and "have routinely been

upheld." *Smallwood v. NCsoft Corp.*, 730 F. Supp. 2d 1213, 1226 (D. Haw. 2010).

Federal and state courts typically evaluate clickwrap agreements by applying state law

contract principles. *See, e.g., Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 28-32

(2d Cir. 2002) (applying California law); *Serrano v. Cablevision Sys. Corp.*, 863 F. Supp.

2d 157, 164 (E.D.N.Y. 2012) ("'[C]lick-wrap' contracts are enforced under New York

law as long as the consumer is given a sufficient opportunity to read the end-user license

agreement, and assents thereto after being provided with an unambiguous method of

accepting or declining the offer."); *Jallali v. Nat'l Bd. of Osteopathic Med. Examiners,*

-11-

*Inc.*, 908 N.E.2d 1168, 1173 (Ind. Ct. App. 2009) (upholding clickwrap agreement under general contract principles). Courts evaluate whether a clickwrap agreement's terms were clearly presented to the consumer, the consumer had an opportunity to read the agreement, and the consumer manifested an unambiguous acceptance of the terms. *See, e.g., Specht*, 306 F.3d at 28-32; *Serrano*, 863 F. Supp. 2d at 164; *Guadagno v. E\*Trade Bank*, 592 F. Supp. 2d 1263, 1271 (C.D. Cal. 2008); *Feldman*, 513 F. Supp. 2d at 236.

Except for a few brief references to clickwrap agreements, Florida and Oklahoma courts have not discussed them in depth. *See Leatherwood v. Cardservice Int'l, Inc.*, 929 So. 2d 616, 617 (Fla. Dist. Ct. App. 2006) (per curiam); *Segal v. Amazon.com, Inc.*, 763 F. Supp. 2d 1367, 1369 (S.D. Fla. 2011); *Rogers v. Dell Computer Corp.*, 138 P.3d 826, 834 (Okla. 2005). But basic contract law principles in Florida and Oklahoma indicate that if a clickwrap agreement gives a consumer reasonable notice of its terms and the consumer affirmatively manifests assent to the terms, the consumer is bound by the terms.[5] *See Rocky Creek Ret. Props., Inc. v. Estate of Fox ex rel. Bank of Am., N.A.*, 19 So. 3d 1105, 1108 (Fla. Dist. Ct. App. 2009) ("A party normally is bound by a contract that the party signs unless the party can demonstrate that he or she was prevented from reading it or induced by the other party to refrain from reading it." (quotations omitted)); *First Nat'l Bank & Trust Co. of El Reno v. Stinchcomb*, 734 P.2d 852, 854 (Okla. 1987)

---

[5] Indeed, Plaintiffs propose this test in challenging Defendants' standard practice. *See* Aplt. Br. at 16 (arguing that "Plaintiffs never received adequate notice of the terms of service, adequate opportunity to review the terms of service, or were required to affirmatively manifest their assent to the terms of service").

(noting that acceptance of a contract's terms may be overcome if there is a "fraud or some equally valid excuse for . . . ignorance" of the terms).

In both states, a contract cannot be formed without the parties' mutual assent to the essential terms of the agreement. *See Gibson v. Courtois*, 539 So. 2d 459, 460 (Fla. 1989); *Sam Rodgers Props., Inc. v. Chmura*, 61 So. 3d 432, 437 (Fla. Dist. Ct. App. 2011); *Dunbar Eng'g Corp. v. Rhinosystems, Inc.*, 232 P.3d 931, 935 n.8 (Okla. 2010). A party who manifests assent to a contract's terms is bound by them, and failure to read the terms is no excuse. *See Consol. Res. Healthcare Fund I, Ltd. v. Fenelus*, 853 So. 2d 500, 504 (Fla. Dist. Ct. App. 2003); *Stinchcomb*, 734 P.2d at 854.

Plaintiffs argue that Defendants' clickwrap agreements do not give customers notice of and a meaningful opportunity to assent to the U-verse terms of service. Their argument relies primarily on the Second Circuit's decision in *Specht*. In that case, the Second Circuit concluded that plaintiffs who downloaded a software "plug-in" called "SmartDownload" could not have reasonably known of the software's associated license terms, which included an arbitration provision. 306 F.3d at 31. To download the software, the plaintiffs visited a webpage and clicked on a "Start Download" button. *Id.* at 22-23. The "sole reference to . . . license terms on the . . . webpage was located in text that would have become visible to plaintiffs only if they had scrolled down to the next screen." *Id.* at 23. In effect, the layout concealed the license terms in a "submerged screen." *Id.* at 32.

The *Specht* court explained that "[r]easonably conspicuous notice of the existence

-13-

of contract terms and unambiguous manifestation of assent to those terms by consumers
are essential if electronic bargaining is to have integrity and credibility." *Id.* at 35. The
court held that the plaintiffs were not bound by the arbitration provision in the license
terms because a reasonably prudent person downloading the free software "would not
have known or learned, prior to acting on the invitation to download, of the reference to
. . . license terms hidden below the 'Download' button on the next screen." *Id.*

Plaintiffs' arguments notwithstanding, Defendants' clickwrap agreements comply
with the principles set forth in *Specht.* Defendants' clickwrap agreements do not conceal
the U-verse terms of service. Under Defendants' description of the standard practice,
technicians present customers with a Welcome Kit containing a printed copy of the
TV/Voice terms and give customers an opportunity to review the terms. Before
technicians proceed with installation, customers must agree to the TV/Voice terms by
clicking on an "I Acknowledge" button on the GCAS web application, which is presented
on the technician's laptop.[6] The GCAS web application displays a checkbox for "Terms
Of Service" and a statement that the customer acknowledges that he has "read,
understand[s], and agree[s] to the content of the documents checked above." Aplt. Appx.

---

[6] Plaintiffs argue that the clickwrap agreement for the TV/Voice terms is invalid
because customers are required to click the "I Acknowledge" button on the *technician's*
laptop rather than the *customer's* computer. This distinction is immaterial. The critical
question is whether customers are given "[r]easonably conspicuous notice of the
existence of contract terms and unambiguous[ly] manifest[] . . . assent to those terms."
*Specht*, 306 F.3d at 35. It does not matter which computer the customer uses to manifest
assent to U-verse terms of service.

-14-

at 883.

Similarly, customers cannot access U-verse Internet service without going through
a registration process on the customer's computer. The process gives the customer an
opportunity to review the Internet terms in a scrolling text box. The customer must click
an "I Agree" button to manifest assent to the Internet terms and to continue with the
registration process and activation of U-verse Internet service.

Defendants' presentation of the U-verse TV/Voice and Internet terms is in stark
contrast to the presentation of terms associated with the software download in *Specht*,
where consumers had (1) no visible notice of accompanying terms, and (2) no indication
that terms were being accepted. U-verse customers are given notice of the U-verse terms
and must affirmatively manifest assent to the terms by clicking "I Acknowledge" and "I
Agree" buttons. The *Specht* court acknowledged that clickwrap agreements similar to
Defendants' agreements are generally enforced. *See* 306 F.3d at 33-34 (citing cases in
which clickwrap agreements were found to be enforceable, including where the
agreement contained a scrolling text box with terms and an "I Agree" button).[7]

Defendants' clickwrap agreements are of the type that are "routinely . . . upheld."
*Smallwood*, 730 F. Supp. 2d at 1226. We see no reason that such clickwrap agreements

---

[7] Indeed, the plaintiffs in *Specht* argued that the "process of obtaining
SmartDownload contrasted sharply with that of obtaining Communicator" web browsing
software provided by the defendant. 306 F.3d at 23. When installing Communicator,
plaintiffs "were automatically shown a scrollable text of that program's license
agreement and were not permitted to complete the installation until they had clicked on a
'Yes' button to indicate that they accepted all the license terms." *Id.* at 21-22.

-15-

would not be valid and enforceable under Florida and Oklahoma law.

### 2. *Additional Challenges to Defendants' Standard Practice*

Plaintiffs assert four other reasons why, in their view, U-verse customers are prevented from knowingly agreeing to the terms of service.

First, Plaintiffs fault Defendants for requiring U-verse customers to agree to separate TV/Voice terms and Internet terms at separate times. Plaintiffs note that Defendants marketed U-verse as a "fully integrated 'entertainment revolution,' with a single installation process, single price, and single bill." Aplt. Br. at 30. In their view, it is reasonable for U-verse customers to assume that the terms that appear as part of the Internet registration are the same as the TV/Voice terms presented in the installation process.

But Plaintiffs cite no law indicating that customers cannot agree to two sets of terms of service presented at separate times. Although U-verse customers are presented with different terms for TV/Voice and Internet services, they must affirmatively manifest assent to both sets of terms. By doing so, U-verse customers are presumed under Florida and Oklahoma contract law to know the contents of each agreement. *See Addison v. Carballosa*, 48 So. 3d 951, 954 (Fla. Dist. Ct. App. 2010); *Stinchcomb*, 734 P.2d at 854. Although Plaintiffs contend that U-verse technicians do not explain the terms of service to each customer, "one cannot avoid [a] contract's obligations by asserting that it was not read, explained or understood." 28 Williston on Contracts § 71:10 (4th ed.); *see Fenelus*, 853 So. 2d at 504; *Stinchcomb*, 734 P.2d at 854.

-16-

Second, Plaintiffs point to evidence that Southwestern Bell scheduled some U-verse installations for only two hours. They argue that "it is beyond improbable to believe that [customers are] presented with an opportunity to adequately review the [TV/Voice and Internet] agreements" in this short period. Aplt. Br. at 34.

We agree with Defendants that Plaintiffs merely speculate that two hours is insufficient for technicians to carry out their duties and for customers to agree to the terms of service. Plaintiffs presented no evidence that customers cannot review and agree to the U-verse terms of service in this period. And, as noted above, once U-verse customers affirmatively manifest assent to the terms of service by clicking the "I Agree" and "I Acknowledge" buttons, it is no defense that they did not take the time to read the terms.

Third, Plaintiffs challenge AT&T's e-mail notifying customers who signed up for Internet service before October 2008, such as Plaintiff Mutzig, of the addition of the Arbitration Clause to the Internet terms. They argue that the "new arbitration provision is buried beneath a series of deliberately misleading statements." *Id.* at 36.

Contrary to Plaintiffs' characterization, the e-mail does not bury the notification of the Arbitration Clause. After three short paragraphs explaining that the Internet terms are changing, the e-mail's first bullet point states: "**Arbitration Agreement**. We have added language that requires customer disputes with AT&T regarding AT&T Internet Services to be submitted to binding arbitration or small claims court." Aplt. Appx. at 427. The e-mail concludes with a link to the new Internet terms and states that "[b]y

-17-

continuing to use the Service, you signify your continued agreement to the terms and conditions set forth in the Terms of Service document." *Id.* AT&T's e-mail sufficiently notifies customers that an arbitration provision has been added to the Internet terms.[8]

Fourth and finally, Plaintiffs assert that Defendants' standard practice "create[s] the reasonable impression that customers would suffer financial penalties if they declined to agree to the terms of service." Aplt. Br. at 38.  Plaintiffs point to a provision in the U-verse order worksheet that allows customers to "cancel this transaction at any time prior to midnight of the third business day after the date of this transaction." Aplt. Appx. at 1680.  In their view, the three-day cancellation window is problematic because the terms of service are not presented to customers until installation, which typically occurs more than three days after a U-verse order.  Plaintiffs also highlight a provision of the order worksheet stating that if a customer cancels service within 30 days of activation, "adjustment will be provided for initial installation charges and one (1) month's service charges, if paid." *Id.* at 1681.

We cannot see how these provisions force customers to accept U-verse terms of service.  The first allows customers to cancel installation within three days.  The second allows customers to cancel all U-verse services within 30 days of activation and obtain a partial refund.  Rather than impose a penalty, the refund provision allows the customer to

---

[8] Plaintiffs have not argued on appeal that the addition of the Arbitration Clause after Plaintiff Mutzig purchased U-verse Internet service is procedurally unconscionable. We therefore do not consider that issue.

continue with U-verse activation to determine whether the customer is satisfied with the service. Plaintiffs have failed to demonstrate how these provisions can be reasonably read to impose penalties that force U-verse customers to accept the U-verse terms of service.

* * *

We conclude that Defendants' standard practice gives U-verse customers sufficient notice of the TV/Voice and Internet terms of service, as well as an adequate opportunity to manifest assent to the terms. We now turn to Plaintiffs' second issue on appeal.

## B. *Alleged Factual Disputes*

Plaintiffs argue that, even if Defendants' standard practice binds customers to the terms of service as a matter of law, factual disputes preclude dismissal of their claims. In Plaintiffs' view, the district court failed to draw reasonable inferences and resolve factual disputes in their favor. They argue that the district court failed to recognize that (1) Defendants' declarations from AT&T employees are not based on personal knowledge of Southwestern Bell's and BellSouth's adherence to the standard practice; (2) Plaintiff Hancock's affidavit demonstrates he did not agree to the U-verse terms of service; (3) none of Defendants' evidence establishes that Plaintiff Cross accepted the U-verse terms; and (4) some evidence suggests that Southwestern Bell technicians do not follow the standard practice. Plaintiffs assert they are entitled to an evidentiary hearing and limited discovery to resolve these issues.

We begin with a discussion of our standard of review and then discuss Plaintiffs' arguments.

1. *Standard of Review*

The district court dismissed Plaintiffs' TV/Voice-related claims for improper venue under Fed. R. Civ. P. 12(b)(3) based on the Forum Selection Clause. It also dismissed Plaintiffs' Internet-related claims based on the Arbitration Clause.

a. *Rule 12(b)(3) and the Forum Selection Clause*

"A motion to dismiss based on a forum selection clause frequently is analyzed as a motion to dismiss for improper venue under [Rule] 12(b)(3)." *K & V Scientific Co. v. Bayerische Motoren Werke Aktiengesellschaft*, 314 F.3d 494, 497 (10th Cir. 2002). Typically, we review the enforceability of a forum selection clause de novo and look to the language of the contract. *Id.*; *see also Milk 'N' More, Inc. v. Beavert*, 963 F.2d 1342, 1345 (10th Cir. 1992). Here, however, Plaintiffs do not challenge the language of the Forum Selection Clause. They dispute whether they accepted the TV/Voice terms at all and allege that factual disputes preclude dismissal of their claims.

In reviewing dismissals for improper venue, we have considered evidence outside the complaint such as a defendant's affidavits. *See Pierce v. Shorty Small's of Branson Inc.*, 137 F.3d 1190, 1192 (10th Cir. 1998). In *Pierce*, we affirmed an order of dismissal because the defendant presented affidavit evidence that "controverted each of the statutory bases for" venue and because the plaintiff "failed to present any evidence in response." *Id.* We explained that a plaintiff may rest on the well-pled facts in the

-20-

complaint to oppose a motion to dismiss for improper venue, but "only to the extent that

such facts are uncontroverted by defendant's" evidence. *Id.*

Although *Pierce* explains that a defendant may defeat a plaintiff's choice of venue

by introducing affidavit evidence of improper venue, the court was not confronted with

conflicting evidence from the plaintiff. Here, both parties cite *Murphy v. Schneider*

*Nat'l, Inc.*, 362 F.3d 1133, 1138 (9th Cir. 2004), to describe the framework that applies to

courts' resolution of factual disputes over proper venue. *See* Aplt. Br. at 43; Aplee. Br. at

29-31. We find *Murphy*'s treatment of factual disputes in the Rule 12(b)(3) context

persuasive.

In *Murphy*, the Ninth Circuit concluded that when a defendant moves to dismiss

for improper venue on the basis of a forum selection clause, "the trial court must draw all

reasonable inferences in favor of the non-moving party and resolve all factual conflicts in

favor of the non-moving party." 362 F.3d at 1138. This summary-judgment-like

framework is "in accord with virtually unanimous authority of the few courts that have

faced this issue." *Id.* As Wright and Miller explain:

> Practice on a motion under Rule 12(b)(3) is relatively
> straight-forward. All well-pleaded allegations in the complaint bearing on
> the venue question generally are taken as true, unless contradicted by the
> defendant's affidavits. A district court may examine facts outside the
> complaint to determine whether its venue is proper. And, as is consistent
> with practice in other contexts, such as construing the complaint, the court
> must draw all reasonable inferences and resolve all factual conflicts in favor
> of the plaintiff.

-21-

5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1352, at
324 (2004) (footnotes omitted).

If the defendant presents evidence that venue is improper and the plaintiff
responds with contrary evidence, "it may be appropriate for the district court to hold a
Rule 12(b)(3) motion in abeyance until the district court holds an evidentiary hearing on
the disputed facts." *Murphy*, 362 F.3d at 1139. We review the decision whether to hold
an evidentiary hearing for abuse of discretion. *Id.* ("Whether to hold a hearing on
disputed facts and the scope and method of the hearing is within the sound discretion of
the district court."). "Alternatively, the district court may deny the Rule 12(b)(3) motion
while granting leave to refile it if further development of the record eliminates any
genuine factual issue." *Id.*

### b. *Arbitration Clause*

Our review of the district court's order dismissing the Internet-related claims and
compelling arbitration is similar to the *Murphy* framework.

We review a district court's grant of a motion to compel arbitration de novo.
*Avedon Eng'g, Inc. v. Seatex*, 126 F.3d 1279, 1283 (10th Cir. 1997). Where, as here, the
parties dispute the existence of an agreement to arbitrate, a court may grant a motion to
compel arbitration if "there are no genuine issues of material fact regarding the parties'
agreement." *Id.* Courts "should give to the opposing party the benefit of all reasonable
doubts and inferences that may arise." *Par-Knit Mills, Inc. v. Stockbridge Fabrics Co.,*

-22-

*Ltd.*, 636 F.2d 51, 54 (3d Cir. 1980); *see id.* at 54 n.9 (comparing standard to summary judgment standard).

\* \* \*

In sum, this framework is similar to summary judgment practice.  Defendants as the moving parties had the burden to show that the Forum Selection and Arbitration Clauses apply to Plaintiffs.  If that initial burden was met, Plaintiffs could attempt to rebut that showing with evidence establishing a genuine dispute as to whether the provisions apply.

We now address Plaintiffs' arguments on appeal.

### 2. *Declarations from AT&T Employees*

In support of their motions to dismiss, Defendants provided the district court with declarations from AT&T employees.  These declarations describe the standard practice for customer acceptance of the TV/Voice and Internet terms of service.  Defendants argued that this evidence was admissible under Fed. R. Evid. 406 to establish that installation technicians followed the standard practice when installing Plaintiffs' U-verse services and that Plaintiffs accepted the U-verse TV/Voice and Internet terms.

### a. *Rule 406 Evidence and Plaintiffs' Competency Argument*

Under Rule 406, "[e]vidence of . . . an organization's routine practice may be admitted to prove that on a particular occasion the . . . organization acted in accordance with the . . . routine practice."  Such evidence is admissible "regardless of whether it is corroborated or whether there was an eyewitness."  Fed. R. Evid. 406.  Courts may accept

-23-

Rule 406 evidence at the summary judgment stage as providing an inference that a routine practice was actually carried out. *See Morris v. Travelers Indem. Co. of Am.*, 518 F.3d 755, 761 (10th Cir. 2008) ("An affidavit from an agent that it was his usual practice to explain the various . . . coverage options constitutes relevant evidence that his conduct on the occasion he met with the insured was in conformity with that routine practice."); *Fed. Kemper Life Assur. Co. v. Ellis*, 28 F.3d 1033, 1040 (10th Cir. 1994) (accepting testimony of an organization's "standard operating procedure" as admissible to show adherence to that procedure on a particular occasion); *Gould v. Winstar Commc'ns, Inc.*, 692 F.3d 148, 161 (2d Cir. 2012) (reversing summary judgment where a jury could infer that an employee reviewed specific documents because "she actively reviewed such documents as a matter of practice"). Because business organizations have a "profit-driven need for regularity," evidence of their routine practice is "particularly persuasive." 2-406 Weinstein's Federal Evidence § 406.03; *see also* Fed. R. Evid. 406 advisory committee's note ("Agreement is general that habit evidence is highly persuasive as proof of conduct on a particular occasion."); *id.* (noting a "trend towards admitting evidence of business transactions between [a] part[y] and a third person as tending to prove that he made the same bargain or proposal in the litigated situation").

On appeal, Plaintiffs do not dispute that Defendants can use Rule 406 routine-practice evidence to show that Plaintiffs were presented with and accepted the U-verse terms of service. In other words, there is no dispute that Defendants may use such evidence to meet their initial burden on their motions.

-24-

Rather, Plaintiffs attack the competency of Defendants' declarations. They note that the declarations are from AT&T employees. Plaintiffs contend that the AT&T declarants are not employees of Southwestern Bell and BellSouth—the regional affiliates whose technicians installed Plaintiffs' U-verse services—and that the declarants demonstrate no personal knowledge of whether those affiliates follow the standard practice that AT&T designed. *See* Fed. R. Evid. 602.

Often, the party objecting to the personal knowledge of a witness's affidavit or declaration moves to strike the document. *See, e.g.*, *Argo v. Blue Cross & Blue Shield of Kansas, Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006). We review a district court's ruling on such a motion to strike for abuse of discretion. *See id.*; *Lantec, Inc. v. Novell, Inc.*, 306 F.3d 1003, 1019 (10th Cir. 2002).

Plaintiffs did not formally move to strike Defendants' declarations, but they did challenge the personal knowledge of the declarants when they opposed Defendants' motions to dismiss and therefore preserved the issue. We see no reason our standard of review should differ from the motion-to-strike context. Accordingly, we review the district court's consideration of the declarations for an abuse of discretion. *See Jewell v. Life Ins. Co. of N. Am.*, 508 F.3d 1303, 1317 (10th Cir. 2007). "An abuse of discretion occurs where the district court clearly erred or ventured beyond the limits of permissible choice under the circumstances." *Wright ex rel. Trust Co. of Kan. v. Abbott Lab., Inc.*, 259 F.3d 1226, 1233 (10th Cir. 2001).

b. *The Declarations*

-25-

The district court relied on declarations from AT&T employees David C. Chicoine, David Saigh, and Michael Frias. In each instance, the declarant describes the standard practice for customer acceptance and attests to personal knowledge, not of a particular customer's acceptance, but of the practice for customer acceptance generally.

Mr. Chicoine's declaration states that he is a "Senior Specialist Network Support" for AT&T and has worked for the AT&T family of companies since 1979. Aplt. Appx. at 878. Mr. Chicoine avers that all statements in his declaration are based on his personal knowledge. He describes the way in which the GCAS web application is displayed to customers, how they agree to the TV/Voice terms through the GCAS web application, and how the acceptance form is completed and stored.

Mr. Saigh's declaration states he has been an "Area Manager for Network Process and Quality" for AT&T since 2008 and has "develop[ed] the methods and procedures for Premises Technicians to install U-verse services." *Id.* at 455. Mr. Saigh avers that all statements in his declaration are based on his personal knowledge and that he has "become personally familiar with the manner in which *customers such as Plaintiffs* receive U-verse services and signify their assent to the Terms of Service that govern TV and Voice services." *Id.* (emphasis added). Mr. Saigh describes the way in which technicians provide customers with the TV/Voice terms and have customers agree to the terms via the acknowledgment form on the GCAS web application. Mr. Saigh also states that because Southwestern Bell's "U-verse activation and acceptance procedures are

-26-

uniform and mandatory," Plaintiff Cross would have accepted the TV/Voice terms in the same manner as other Plaintiffs. *Id.* at 457.

Finally, Mr. Frias's declaration states he is a "Senior Product Manager" with AT&T who is "familiar with the provision of U-verse Internet service to residential customers, the Terms of Service pursuant to which those customers receive U-verse Internet service, [and] the process by which new customers accept those terms of service." *Id.* at 338-39. Mr. Frias states that all facts in the declaration are of his own personal knowledge, and he describes the way in which U-verse customers agree to the Internet terms of service.

### c. *No Abuse of Discretion*

Each of the declarations indicates the declarant has personal knowledge of the standard practice for customer acceptance of U-verse terms of service. Although Messrs. Chicoine, Saigh, and Frias are not employees of Southwestern Bell and BellSouth, they are employees of the entity that is "ultimately responsible for AT&T U-verse in the areas provisioned by Southwestern Bell . . . and BellSouth." *Id.* at 1051. And because AT&T relies on regional affiliates to install U-verse, it follows that Messrs. Chicoine, Saigh, and Frias have personal knowledge of how Southwestern Bell and BellSouth have customers

-27-

accept U-verse terms.[9] The Saigh declaration indicates as much, stating that

Southwestern Bell's practice is uniform and mandatory.[10]

Plaintiffs are correct that the declarations are not based on personal knowledge of

what happened when the individual Plaintiffs acquired U-verse services. But such

personal knowledge is not required to admit Rule 406 routine practice evidence. *See*

*Derby & Co., Inc. v. Seaview Petroleum Co.*, 756 F. Supp. 868, 876 n.8 (E.D. Pa. 1991)

(explaining that although witness did not have personal knowledge of particular instance,

he did claim to have personal knowledge of routine practice, which "is all that Rule 602

requires for testimony to be admissible pursuant to Rule 406"). The declarations are

based on personal knowledge of the standard practice followed when customers generally

acquire U-verse services. Evidence of that standard practice is offered to support an

inference about what happened when the individual Plaintiffs acquired U-verse. Once

---

[9] Plaintiffs point out that AT&T has described itself as legally and factually distinct from the regional affiliates. However, AT&T's description of the corporate relationship between it and the regional affiliates does not contradict its position that it "is the entity ultimately responsible for AT&T U-verse in the areas provisioned by Southwestern Bell . . . and BellSouth." Aplt. Appx. at 1051.

[10] Plaintiffs cite *Farley v. Oak Ridge Med. Imaging, P.C.*, E200801731COAR3CV, 2009 WL 2474742, *20 (Tenn. Ct. App. Aug. 13, 2009), as holding that an employee from one organization cannot testify as to the routine practices of a separate organization. In that case, the Tennessee Court of Appeals concluded that there was no evidence of a hospital's routine practice of mailing to show that letters had been deposited in the mail. *Id.* There was only evidence from a non-hospital employee who testified that mailings are deposited at the hospital with the expectation that they would be mailed. *Id.*

Here, however, there is evidence of a routine practice from declarants who aver they have personal knowledge of the practices described.

-28-

this evidence was offered in support of Defendants' motions, Plaintiffs had the
opportunity to rebut it.

It may have been better for Defendants to provide declarations from Southwestern
Bell and BellSouth employees regarding standard practice for customer acceptance.
Nevertheless, the AT&T declarants demonstrated personal knowledge of the standard
practice designed for regional affiliates, as well as personal knowledge that U-verse
customers such as Plaintiffs generally accept terms of service through the standard
practice.  This was enough to raise an inference that the standard practice was followed
when Plaintiffs obtained U-verse service and shifted the burden to Plaintiffs to raise a
genuine factual dispute.

We conclude that the district court did not "venture[] beyond the limits of
permissible choice" when it accepted Defendants' declarations as relevant and probative
evidence of Plaintiffs' acceptance of the U-verse terms.  *Wright*, 259 F.3d at 1233.  The
district court's reliance on the declarations therefore was not an abuse of discretion.

### 3.  *Hancock Affidavit*

To avoid enforcement of the Forum Selection and Arbitration Clauses, Plaintiffs
were required to counter Defendants' declarations with evidence raising a genuine factual
dispute regarding whether they accepted the U-verse terms.  Plaintiffs proffered the
Hancock affidavit, which states that Plaintiff Hancock "did not 'click on' ANY
acceptance of U-verse 'Terms of Service' when [he] bought U-verse, and the salesman
never told [him] about any 'Terms of Service.'"  Aplt. Appx. at 1802.  It also states

Plaintiff Hancock "was never aware of the fact that there were actually multiple terms of
service for TV, [Voice] and Internet services." *Id.* The district court concluded that this
affidavit failed to specifically dispute Defendants' evidence of customer acceptance of U-
verse terms.

On appeal, Defendants argue that the district court's view of the Hancock affidavit
was correct. They note that the affidavit refers to a specific point in time: when Plaintiff
Hancock purchased U-verse service from a salesperson. Defendants do not dispute that
U-verse terms are not presented when customers purchase U-verse from a salesperson.
The relevant point in time, Defendants argue, is when the U-verse technician installs the
service and the customer is presented with the U-verse terms.

Plaintiffs respond that the district court should have drawn all reasonable
inferences and resolved all factual conflicts in their favor. *Murphy*, 362 F.3d at 1138.
One reasonable inference to be drawn from the Hancock affidavit, they argue, is that it
describes the entire process of obtaining U-verse, including installation. They contend
that the difference between a U-verse salesperson and a technician is a "pedantic" one
and that the district court should not have inferred that Plaintiff Hancock was aware of
such a "fine-grained distinction[]." Aplt. Reply Br. at 19.

First, we agree with the district court that the Hancock affidavit does not
specifically dispute Defendants' standard-practice evidence of customer acceptance of U-
verse terms at the time of installation. The affidavit does not mention the installation
process or U-verse technicians. This absence is conspicuous because Mr. Chicoine's and

-30-

Mr. Saigh's declarations focus on U-verse TV/Voice installation and the actions of

installation technicians. Nor does Plaintiff Hancock dispute receiving the TV/Voice

terms in a Welcome Kit or engaging in the Internet registration process described in Mr.

Frias's declaration. Mr. Hancock had the Chicoine, Saigh, and Frias declarations in hand

at the time he prepared his affidavit, and it would have been simple to dispute

Defendants' version of the standard practice, if in fact he could. The Hancock affidavit

does not.

Second, we disagree with Plaintiffs that it is reasonable to infer that the affidavit

describes the entire process of obtaining U-verse, including installation, and that Plaintiff

Hancock was unaware of a distinction between salespersons and technicians. Although

the distinction between U-verse salespersons and installation technicians may be

"pedantic," it is a distinction that Plaintiffs have acknowledged since the beginning of

this litigation.

Their complaint states that "Plaintiff Hancock purchased . . . U-verse . . .

following solicitation by a door-to-door *salesman* peddling U-verse." Aplt. Appx. at 34

(emphasis added). Plaintiffs' briefing to the district court differentiated between

salespersons who approached Plaintiffs to sell U-verse and technicians who installed U-

verse. *Compare id.* at 1331 ("The Plaintiffs were approached by salespersons, usually at

home, selling the bundled product called U-verse."), *with id.* at 1333 ("[T]he installation

process is done by the AT&T technician."). The Hancock affidavit was drafted

contemporaneously with and in support of Plaintiffs' briefing that differentiated between

-31-

salespersons and technicians. Thus, we cannot reasonably infer that Plaintiff Hancock's

affidavit describes more than the sale and purchase of U-verse from a salesperson.

It is possible that U-verse technicians who installed Plaintiffs' services did not

follow the standard practice. But we have no evidence to help us draw that conclusion.

Plaintiffs had the opportunity to provide declarations or affidavits to dispute that U-verse

technicians followed the standard practice when installing their services. They offered

only the Hancock affidavit, which focuses on the point of U-verse sale, not the relevant

time of installation. Because Plaintiffs failed to raise a genuine factual dispute regarding

acceptance of the U-verse terms at the point of installation, the district court did not err in

denying an evidentiary hearing. *See Murphy*, 362 F.3d at 1139 (explaining that the

nonmoving party may be entitled to an evidentiary hearing *if* the party asserts sufficient

facts to preclude enforcement of a forum selection clause).

### 4. *Plaintiff Cross*

Plaintiffs argue that the district court erred in concluding that Plaintiff Cross

accepted the U-verse terms. They note that Defendants presented no records indicating

that Plaintiff Cross accepted the TV/Voice and Internet terms.

In the district court, Defendants presented records showing that Plaintiffs

Bollinger, Hancock, and Mutzig accepted the U-verse TV/Voice and Internet terms. Mr.

Saigh's declaration states that no records showed Plaintiff Cross as a U-verse customer,

and Defendants suggest that "AT&T was unable to identify Cross's account or associated

records because the complaint disclosed nothing more than Cross's name and state of

-32-

residence." Aplee. Br. at 9. Mr. Saigh also stated that Plaintiff Cross, a resident of

Oklahoma, would have experienced the same standard practice as other Southwestern

Bell customers.

Defendants were entitled to rely on the declarations describing the standard

practice to show that Plaintiff Cross accepted the terms of service. Plaintiffs provided no

contrary evidence, such as an affidavit from Plaintiff Cross, disputing that U-verse terms

of service were presented and accepted at the time of installation. Because Plaintiffs

failed to present such evidence and raise a disputed issue of fact, the district court did not

abuse its discretion in denying an evidentiary hearing.

### 5. *Evidence of Southwestern Bell's Practices*

Finally, Plaintiffs argue that some evidence suggests that Southwestern Bell's

installation of U-verse was not uniform and mandatory. They note that the "U-verse

order forms state that installation will take between four and six hours" but that

"Southwestern Bell appears to have only scheduled two hours for installation of U-verse

services" for Plaintiffs Hancock and Mutzig. Aplt. Br. at 8-9. From this, Plaintiffs

conclude that Southwestern Bell does not follow the standard practice AT&T designed.

We reject this argument. It is not reasonable to infer that because Southwestern

Bell schedules some installations for less time than stated on the U-verse order form that

it also does not have customers agree to the terms of service. Regardless of the length of

time scheduled for installation, the Saigh declaration explains that TV/Voice installation

does not proceed unless the customer accepts the TV/Voice terms. And customers accept

-33-

the U-verse Internet terms by completing a registration process that does not depend on the length of installation time.

Further, the order form merely notifies customers that "[s]tandard U-verse installation averages four (4) hours," Aplt. Appx. at 1407, and asks customers to "reserve four (4) to (6) hours of your day to be home for the installation," *id.* at 1409. These statements do not conflict with a scheduled installation time of two hours.

\* \* \*

The district court was within its discretion to consider the Chicoine, Saigh, and Frias declarations as evidence that Southwestern Bell and BellSouth follow a routine practice of customer acceptance of U-verse terms. It also acted within its discretion in denying an evidentiary hearing because Plaintiffs offered no evidence contradicting Defendants' standard practice, including the Hancock affidavit, which does not raise a factual dispute whether Plaintiff Hancock accepted the U-verse terms of service at the time of installation. Plaintiffs also failed to provide conflicting evidence that Plaintiff Cross did not accept the U-verse terms. Finally, evidence that Southwestern Bell scheduled two hours for installation, when the average is four hours, does not create a reasonable inference that the company does not adhere to the standard practice of customer acceptance of U-verse terms.

## III.   **CONCLUSION**

For the foregoing reasons, we affirm the district court's orders dismissing Plaintiffs' TV/Voice-related and Internet-related claims.

-34-